May it please the court, I'm James Tree, the attorney representative for Mr. Smith, who we are here on a de novo review from a denial of an administrative law judge on a claim for supplemental security income. Mr. Smith, we've got a good history on his case because he grew up in a rural area in south central Washington state where he had a family psychiatrist that treated him for over two years when he was a child. And those records, he summarized those records. In addition, we have Dr. Doherty, a clinical psychologist who reviewed and examined Mr. Smith for the first time in 2006, but was provided a history from Child Protective Services and a social worker into his background. Marcus, we get a good glimpse into Marcus' early upbringing. At age two, he was locked in a room in his house for days at a time. His mother suffered from major depressive disorder with psychotic features and a borderline personality disorder, according to the family psychiatrist, Dr. Ferber. His siblings also suffered severe mental impairments. Marcus continued to be locked in his room frequently until finally at the age of seven, he became so frustrated he set his own bed on fire and was institutionalized when he decompensated at that time. He was taken by Child Protective Services and placed in foster homes, many of which he ran away from and became a very angry young man. He attempted to commit suicide at age 16 by rolling a pickup truck. Eventually, he was diagnosed with a severe narcissistic personality disorder with antisocial, dependent, and avoidant features. The administrative law judge said his only mental limitation was that he could have superficial contact with others. Other than that, he didn't have any other limitations. What is his employment history? The administrative law judge rejected Dr. Ferber and Dr. Dougherty's statements. Here we see, as we look at Mr. Smith's development, we see a perfect textbook example of someone with a severe personality disorder. The DSM, the Diagnostic Statistical Manual for Mental Disorders, tells us that this begins in adolescence. It doesn't begin later in life, in adulthood, but if you have a true personality disorder, it begins in adolescence. It's fostered by an atmosphere of emotional neglect and exactly the type of situations that Mr. Smith encountered as he was growing up. He continued to show this inability to tolerate work-type situations. Is there any case law regarding whether that kind of personality disorder is a disability of the kind that is compensated? That, um... I've never seen that. Yeah, I don't know. It would be a good published decision to have. Well, I don't know. I mean, it seems to me that a personality disorder is essentially somebody with... I mean, this guy just had all kinds of serious problems. He was... in the sense that he was violent and he was angry and somewhat dangerous and he couldn't get along with people and I don't know whether that's the sort of... I've never seen a case in which that kind of mental issue is a mental health problem that makes you eligible for Social Security. It essentially says if you're a criminal, you can get Social Security. I mean, that's a little unlikely. Yeah, I mean, is the guy a jerk and he doesn't have a disabling impairment or does he have a personality disorder that's so persuasive that he can't control it? And Social Security does recognize personality as a listed impairment, listing 12.08 under their list of impairments as an impairment for personality disorders and a person can receive disability for personality disorders, yes. What does the record show is the relationship between the personality disorders and the obesity? Oh, boy. I'm not sure. I'm not sure if I saw a clear connection there, but I think that the... There has to be some. Yeah, I would think so. The Social Security ruling 02-1P is the obesity Social Security ruling that says it's a very complex disease process that can be factored in by mental impairments as well as far as metabolism and all sorts of different factors that are very complicated that the ruling says. In this particular case, one of the things that Mr. Smith was criticized for was not attending a consultative exam after the administrative law judge hearing. At the hearing, the judge had called a psychologist to testify at the hearing but didn't have the psychologist testify because Social Security had failed to give the psychologist all the updated medical records. They were in the file, but they had failed to forward and cure. She only had through 15F and there was exhibits through 20F at the time in the file, and so she didn't feel confident to testify. And the psychologist says, well, I would like to see the updated records, or if you don't have updated records, then send him out for a consultative exam. And so instead of the records being forwarded to that psychologist that had already studied through 15F, he was scheduled for a consultative exam in Portland, Oregon, which was 130 miles from Goldendale, where he lived. He called up and said, I can't go unless you give me extra time. I get claustrophobic. I get anxiety. I'm going to need some breaks along the way. And if you can't give those to me, I can't go. The response came back from the transportationists that their feeling of what happened was they felt threatened and they didn't feel safe to give him a ride. And so his appointment was canceled, not because he refused to go, but because that's the nature of his personality disorder. People feel threatened by him. It's not a good thing. I'm not advocating that. He doesn't treat children right. He doesn't treat women right. But that is a symptom of his personality disorder, which is recognized by the Social Security Administration as a disabling impairment. He also, Your Honor, I would like to discuss his obesity, because I think that's an important aspect of his case also. The administrative law judge gave several reasons why she was rejecting Mr. Tuning, who was his physician's assistant for many years and knew him very well, both from the emergency room and from treating him in his clinic. Mr. Tuning worked under the direction of Dr. Garnett, who had also seen Mr. Smith. Both Dr. Garnett and Mr. Tuning prepared a medical source statement that indicated that they felt that his back impairment was caused by his obesity. Mr. Tuning separately stated that his postural limitations of bending, stooping, crouching, crawling, and several others were all related to his obesity. He also stated that his fatigue was caused by his obesity. These are all supported in the Social Security Rule in 02-1P, which says that obesity can be a disabling impairment in and of itself without any other impairment, either at Step 3 by equaling a listing, because Social Security did away with the old listing on obesity, but currently they say that you can equal a listing, or conversely at Step 5 of the process by the residual functional capacity is so compromised that they cannot sustain employment. And that is exactly what Dr. Garnett and Mr. Tuning said in their report, which was one of the very last exhibits that the Administrative Law Judge had to review, and it was done just shortly before the hearing, was that his obesity causes back pain, that as a result of that he had to lay down four hours during the day, and if he had a job to do, he would miss four or more days of work per month. Social Security Rule in 96-8P says that for a person to be able to do substantial gainful activity, they must be able to work eight hours a day, five days a week, day in and day out. I understand the ALJ discounted Tuning in part because he didn't give him any relevant pain medication. Yes. And that's true, he didn't, right? No, he did prescribe him ibuprofen. Well, yes, but. A prescription ibuprofen. Interestingly enough, the ALJ also criticized Mr. Smith because he was trying to get pain medication because it's, she said, contraindicated because of your background, because he used to take methamphetamines. You know, that's the neat thing about Mr. Smith is he's got all this stuff and all this baggage, and he turned very angry, criminal behavior, methamphetamines, and at a point he realized that he was doing the same thing to his children that had happened to him. He had locked his own kid up in a room. He had taken a chainsaw and threatened to cut off his kid's arms and legs and then set the chainsaw by the bed and told the kid to behave and not get out of bed. He went into counseling, and that was the only thing that motivated him because, as Dr. Doherty said, he says, this guy is going to be a handful for a therapist because he has been messed around so much in his life, he feels he has to be in control. He has to have a lot of reassurance. And those are the statements that were made by Dr. Doherty about him, which shows he can't have, the judge says he has to have only superficial contact with a supervisor, but he has to have lots of reassurance. She didn't address that conflict because if you're going to have lots of reassurance, you've got to have more than superficial contact, and when that happens, things escalate. And so he's working on his therapy. He went from a situation of criminal behavior to isolation to avoid those types of situations. He says his motivation is he wants to be able to have contact with his children. And so he was working, but near the end, I think it was about March of 2008, Stephen Wolpert, who was his longtime counselor, said that he's making some progress, but it appears to be short-term in nature. It's up and down, up and down. But where did the ALJ go wrong here? I mean, if you could put it into a nutshell, is this because he didn't relate the various problems that he had or she? Judge, the Honorable Betty Fletcher in Costas, your case in the Costas Court, said that somebody had talked about routine social security cases. She says that's a misnomer. These are so fact-intensive and medically cause a lot of medical expertise. And this case really embolizes this because there's so many fact-intensive things in this case where she just picks things out of context. And I just think she cumulatively made so many errors because they- Why don't you give us four of them because it would be helpful. Okay. I just picked that number out of the hat, but some of them- I will. I'll give you four. She says that Mr. Tooney said that there were no functional limitations caused by obesity, whereas he said that his back pain was caused by his obesity, his postural limitations were caused by his obesity, his fatigue was caused by his obesity, his obesity would cause him to lay down four hours during the day, and his obesity would cause him to miss four more days of work per month. That's one. She said there was no objective findings to support it, yet she found in her decision that he had a BMI of 58.5, which is at the highest level of obesity according to Social Security ruling 02-1P. It's where people develop significant disease process from obesity at the level three level, which starts at a BMI of 40. His is 58.5. That is objective evidence in this particular case. She apparently thought that he needed to have separate imaging studies of back arthritis or a herniated disc or he would not be able to support his back pain. But both Dr. Garnett and Mr. Tooney said that the back pain was caused by his obesity, which is well documented, and there is objective evidence to find that. She said that he did not give him any medications for obesity. That wasn't true. He gave him equestrian light, which is an absorption for fat, and he prescribed that for him. She said that Mr. Tooney consistently said in his chart notes, in no acute distress, he never said it once. We brought that out in our brief, and the commissioner points to no place in the record. I could find no place in the record where Mr. Tooney ever said that, let alone said it consistently. She said basically that, yes, there are many, many opinions in this record that support disability, but they're all on checkbox forms or on questionnaires, and I give them no weight. She just gave them no weight. There are many of those. For example, Your Honor, in 2004, 2005, 2006, 2007, 2008, mental health professionals said he had a marked impairment in the ability to tolerate the normal expectations of normal work activities. She gave him every one of those for every year, no weight. Dr. Doherty said that he would have an inability to tolerate the stress of work and that he would likely get into an angry situation where it would escalate into law enforcement type action. So there's many, many places in the records that support disability. And in our opening brief, we cited 20 specific examples of where we believe the record shows that the administrative law judge improperly applied the facts. Your Honor, your time. Let's hear from the commissioner. Good morning. May it please the Court, Jeff Staples on behalf of the commissioner. This court should affirm the commissioner's final decision because it was supported by substantial evidence and was free of legal error. I'd like to start by pointing out an issue that may resolve some subsequent issues, which is the waiver issue. Mr. Smith failed to raise a number of issues before the district court, and those issues are therefore waived and may not be presented here, such as the credibility, the step two, and the lay witness statement of Ms. Garcia. Because those were presented, this court need not consider them. Without waiving those objections, I will discuss those issues to the extent the court finds them helpful. As far as the credibility finding goes, the ALJ gave a number of clear and convincing reasons for finding Mr. Smith not credible, including one reason which Mr. Smith has not challenged before this court, which is that Mr. Smith's activities of daily living were inconsistent with his statements. One of the things he said, for example, was he chopped wood. And what he actually said was, I tried to chop wood, but I couldn't chop wood. So that was just wrong. That may have been a, the ALJ may have misconstrued Mr. Smith's testimony on that basis, but there were other activities of daily living that were very specifically inconsistent. Such as? Such as Mr. Smith alleged he had no friends and that his family were basically his only social life. That's at page 33. Versus other evidence in the record that he went to monster truck racing, to community days, that he enjoyed meeting and talking to people online and arguing with friends. That was from Ms. Garcia's testimony. Those are inconsistent. Another thing was that he wasn't able to sustain attention. That was inconsistent with Ms. Crapo's statement that he was able to watch TV with her for extended periods, prepare complete meals, and go camping with her. Also weighing against Mr. Smith's credibility was Dr. Dougherty's report describing various exaggeration and deceptive tendencies that furthermore undermined Mr. Smith's credibility. One thing that bothered me, which we haven't discussed so far, was the question about his carpal tunnel, or if it wasn't carpal tunnel, whatever it was. His wrists. His wrists. And the reason it seemed significant, it wasn't necessarily because it would demonstrate that he couldn't work. Apparently several people said he could work. But that particular problem was not factored into the RFC, and what the vocational expert came out with were things that required really terrific use of hands, right? The jobs that the vocational expert listed did, yes. Right. And it seemed to be generally agreed that he had some probably congenital problem with the use of his hands, maybe not severe, but a problem. Well, because the ALJ found that this alleged impairment did not cause any significant interference with Mr. Smith's ability to perform basic work activities. There was nothing that needed to be factored into the residual functional capacity finding. But wasn't there consistent evidence that he did have problems using his hands? Well, Dr. Peterson and Dr. Jones both. Well, one of them said he had full mobility or something, meaning the shoulder, but no one said he had full mobility of his wrists. He didn't. Yes, Dr. Peterson and Dr. Jones both identified the alleged carpal tunnel and found that it did not cause significant interference with Mr. Smith's ability to perform basic work activities. Dr. Peterson's opinion is at transcript 184 to 87, and Dr. Jones' is at 261 to 64. That supports the ALJ's Step 2 finding, which I might add was waived for not being raised. No activities, including assembling small things? Well, Dr. Peterson and Dr. Jones didn't think that it had any significant interference, so that includes the jobs that were identified at Step 5, yes. With regard to the ALJ's assessment of the other medical opinion evidence, Mr. Wolpert is not an acceptable medical source, and the ALJ was required to give germane reasons for rejecting his opinion, which the ALJ did. He found Mr. Wolpert's opinion was inconsistent with his treatment notes, which document anxiety and depression that are very closely linked to situational life events. When Mr. Smith was having difficulty with his relationships or with his finances or with his living situation, those were the times when he was anxious or depressed, as a normal person would be. But when he wasn't suffering from those life events, he was managing his symptoms adequately, he was in a better mood, and he was able to deal with normal, everyday interactions. The ALJ also provided germane reasons for rejecting Mr. Tuning's opinion, because it was inconsistent with the treatment records, which showed, quote, labs which really looks pretty good, and that Mr. Tuning did not order any imaging studies to document the alleged back pain. Moreover, he did not prescribe any medications beyond ibuprofen, and although the ALJ was not correct in saying that Mr. Tuning provided no obesity medication, as opposing counsel pointed out, he did offer Questrin Lite, but the other reasons remained supported. The ALJ also incorporated many of these limitations into the RFC, residual functional capacity finding, in terms of limiting Mr. Smith to no more than superficial interactions with others. So to the extent that these opinions do describe those limitations, and to the extent that the ALJ did not properly reject those, they are incorporated by that limitation. I would also point out that the ALJ's hypothetical to the vocational expert described greater limitations than were accounted for in the residual functional capacity finding, and included limitations to simple instructions and procedures and simple tasks. So to the extent that the ALJ did not adequately account for opinions that describe those limitations, they were accounted for in the vocational hypothetical. Because the ALJ reasonably weighed the medical and testimonial evidence, and those findings are supported by substantial evidence in the record and are free of harmful error, we would ask that this Court affirm the Commissioner's final decision, unless there are any further questions that I can address. Thank you.
judges: Schroeder, Paez, Berzon